IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| APRIL A. J., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:24CV672 |
| | ) |
| FRANK BISIGNANO, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff April A. J. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on July 31, 2019, alleging a disability onset date of December 3, 2014. (Tr. at 23, 172-78.)[2] Plaintiff's application was denied initially (Tr. at 71-82, 100-03) and upon reconsideration (Tr. at 83-99, 107-14). Thereafter, Plaintiff

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #6].

requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 115-16.) On December 8, 2020, Plaintiff, along with her attorney representative, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 23.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 34), and on January 25, 2021, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

On August 8, 2021, Plaintiff filed a claim in this Court challenging the Commissioner's decision. (See Civil Docket No. 1:21CV630.) After reviewing Plaintiff's arguments [Doc. #12], the Commissioner conceded that further evaluation of Plaintiff's claim was warranted and therefore moved for remand [Doc. #14]. Accordingly, the Court entered an Order and Judgment [Docs. #16, #17] reversing the Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and remanding the case to the Commissioner for further proceedings. This action terminated the original civil case in this Court.

On February 7, 2024, the same ALJ held a second telephonic hearing, at which both Plaintiff and an impartial vocational expert again testified. (Tr. at 565.) Following the hearing, the ALJ ultimately concluded that Plaintiff was not disabled under the Act. (Tr. at 576.) The ALJ's decision became final when the Appeals Council did not review the ALJ's decision within 60 days. (See Tr. at 563.) Plaintiff then filed the present civil action in this Court.

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the

scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

Case 1:24-cv-00672-JEP   Document 14   Filed 09/30/25   Page 4 of 16

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

III. <u>DISCUSSION</u>

In the present case, the ALJ first found that Plaintiff's "date last insured" for purpose of DIB benefits was December 31, 2019. The focus of the determination was therefore whether Plaintiff was disabled during the period from her alleged onset date in December 2014 through her date last insured in December 2019.

At step one, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between her alleged onset date, December 3, 2014, and her date last insured, December 31, 2019. (Tr. at 568.) The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 568.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> diabetes mellitus with retinopathy; neuropathy; asthma; and chronic obstructive pulmonary disease[.]

(Tr. at 568.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 570.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, as of her date last insured, she could perform a range of light work with the following, additional limitations:

> [Plaintiff could] lift and carry 40 pounds occasionally and 20 pounds frequently; sit for 6 hours in an 8-hour workday; stand and walk for 4 hours in an 8-hour workday, each for 1-hour at a time followed by at least 5 minutes in a seated position wherein they could still perform work functions; frequently finger and feel with bilateral upper extremities; avoid concentrated exposure to workplace hazards such as unprotected heights and moving machine parts; no more than frequently operate a motor vehicle or other heavy equipment; avoid moderate exposure to fumes, dusts, gases, pulmonary irritants, heat, and humidity; frequent[ly] perform tasks requiring near and far visual acuity; requires workplace illumination at office level of 300 LUX; and would be off-task 5% of the workday (to check blood sugar levels, etc.).

(Tr. at 571.) At step four of the analysis, the ALJ found, based on the vocational expert's testimony, that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 575.) However, the ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 575-76.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 576.)

Plaintiff now contends that "[t]he ALJ's decision lacks a logical explanation to connect the evidence of record with the RFC conclusion that [Plaintiff] 'would be off-task 5% of the workday (to check blood sugar levels, etc.).'" (Pl.'s Br. [Doc. #10] at 11.) Plaintiff argues that this limitation "is arbitrary absent additional explanation and prevents substantial evidence from supporting the [ALJ's] decision" (Pl.'s Br. at 3.)[5]

Where an ALJ renders a specific off task percentage in the RFC assessment, the "ALJ must explain and support that conclusion with substantial evidence," just as he must sufficiently explain the basis for all RFC limitations. Berry v. Comm'r of Soc. Sec., No. 3:21-cv-00240-RJC, 2022 WL 3354778, at *2 (W.D.N.C. Aug. 12, 2022). Thus, "[m]any courts in the Fourth Circuit . . . require the ALJ to explain how he or she arrived at the off-task percentage." Id. (collecting cases) (finding that where the ALJ never discussed the percentage of time off task anywhere other than the conclusory determination, it was impossible for the court to determine whether the RFC was supported by substantial evidence); see also Keith L. v. Saul, No. DLB-20-930, 2021 WL 1723084, at *2 (D. Md. Apr. 30, 2021) ("Without a

---

[5] Plaintiff does not raise any other challenge regarding the remainder of the ALJ's analysis or the other aspects of the RFC. Therefore, the Court's discussion addresses only the issue raised by Plaintiff regarding the sufficiency of the ALJ's explanation for the time off task restriction in the RFC.

narrative explanation of how the evidence supports the ALJ's seemingly arbitrary conclusion that plaintiff would be off-task five percent of the workday, the Court cannot engage in meaningful substantial evidence review.").

Notably, the vast majority of cases involving time off task, including Berry and Keith cited above, as well as the other cases relied upon by Plaintiff, incorporate a time off task restriction to account for a claimant's mental limitations, most often a reduced ability to maintain attention, concentration, or pace, as a result of a mental impairment and/or pain. (See Pl.'s Br. at 14) (citing Uribe v. Comm'r of Soc. Sec., No. 5:21-CV-160, 2023 WL 1868241 (W.D.N.C. Feb. 8, 2023); McNeely v. Saul, No. 2:20-cv-158, 2020 WL 5648214 (S.D.W. Va. Sept. 4, 2020); Richardson v. Saul, No. 4:19-CV-128-FL, 2020 WL 3816317 (E.D.N.C. Jun. 9, 2020); Conary v. Berryhill, No. 2:18-cv-01228, 2019 WL 3216041 (S.D.W. Va. Jun. 25, 2019); Patricia W. v. Berryhill, No. 1:19-cv-9, 2019 WL 6790512 (D. Md. Dec. 12, 2019); Kennedy v. Berryhill, No. 3:18-cv-405-RJC, 2019 WL 3664936 (W.D.N.C. Aug. 6, 2019)). By their very nature, these mental restrictions often defy exact quantification, as they seek to approximate the amount of time an individual's symptoms will distract her from work in the course of an 8-hour workday.[6]

---

[6] Notably, the analysis differs when the ALJ finds that the Plaintiff would be off task "no more than" ten percent of the day, and includes sufficient explanation for concluding that Plaintiff's mental limitations were not disabling. Shaw v. Kijakazi, No. 1:20CV581, 2021 WL 3079905, at *9 (M.D.N.C. July 21, 2021) (finding no error where the ALJ found that the Plaintiff "'would be off task no more than ten percent of the time in an eight-hour workday" because "the ALJ found that [the p]laintiff's depressive disorder caused some limitation in [his] ability to remain on-task but not disabling limitations," given the vocational expert's testimony that time off-task up to ten percent was not work preclusive) (citing Link v. Saul, No. 1:19CV662, 2020 WL 5044038, at *9 (M.D.N.C. Aug. 26, 2020) (holding that the ALJ's findings at step two, the analysis of Plaintiff's subjective symptom reporting, and the evaluation of objective evidence "adequately explained the RFC's allowance for [the p]laintiff to remain off-task for up to 10 percent of the workday in addition to normal breaks"), recommendation adopted, slip op. (M.D.N.C. Sept. 10, 2020) (Biggs, J.)).

In contrast, where, as here, an off-task percentage stems from a purely physical impairment, courts within this Circuit have found an exact percentage of time off task susceptible to review and supported by substantial evidence. In <u>Painter v. Berryhill</u>, No. 2:17-CV-04435, 2018 WL 5904510, at *11 (S.D.W. Va. Oct. 19, 2018), the ALJ included an additional five percent off-task in the RFC finding to accommodate the need for one to two additional bathroom visits per day, in addition to normal breaks, due to the claimant's Crohn's Disease symptomology. Notably, the ALJ specifically relied on the claimant's hearing testimony when making this finding. In finding the ALJ's off-task finding supported by substantial evidence, the court held as follows:

> [C]ontrary to Claimant's representation that the basis for the ALJ's finding was unclear, a review of the record demonstrates that the ALJ's five percent figure was based entirely upon a reasonable estimate of the time that Claimant spent in the bathroom combined with the number of bathroom visits she typically made during her waking hours, taking into account her testimony, her reported activities, the medical information related to Crohn's disease, [her treating provider's] statement, the number of hours in a workday, and the number of waking hours left in the day outside of work. When piecing this evidence together, the ALJ's conclusion that Claimant would require time for a total of four to five bowel movements while at work was imminently reasonable.

<u>Id.</u>, 2018 WL 5904510, at *12.

A review of the record in the present case reveals that the ALJ conducted a rational analysis of the evidence analogous to that at issue in <u>Painter</u>. In particular, Plaintiff testified extensively regarding her diabetes management. First Plaintiff testified that approximately once a week she might have an incident where she needs to eat or drink something sweet to manage her blood sugar and "allow the time to get my sugar back up" (Tr. at 593-94):

> Q Okay, okay. Do you have problems with that where you're working now that you have your blood sugar get too low, and you'll have to stop working and sit down and use the glucose inhaler?

> A   Yes. I've had to use it probably four times since August [through February, approximately 6 months]. Other times, I've had to – it's at least once a week that I have to get it back up by eating something or drinking something sweet.
>
> Q   Okay. So once a week – this is once a week at work or just once a week generally?
>
> A   No, that's just at work.
>
> Q   Okay. So once a week at work, you'll have to stop work to deal with your diabetes an – and manage your blood sugar level by eating something or drinking something?
>
> A   I used to have to eat something at – well, every day, but the severe ones is at least once [a week] out of the . . . days I work.
>
> Q   Okay. When that happens, how long do you have to stop for?
>
> A   Sometimes a half an hour depending on how severe and how long it takes for my sugar to come back up.

(Tr. at 594.) Second, Plaintiff further testified that she used a glucometer to check her sugar levels (Tr. at 598):

> Q   . . . How often do you have to check your monitor by the way?
>
> A   The one I carry around? I check it every hour.
>
> Q   How long –
>
> A   At least or if it alerts, it doesn't take long. It's just if I hit one button or if it's alerting me if it's too high or too low. Of course, you know, that happens whenever.

(Tr. at 599.) Third, Plaintiff testified regarding giving herself insulin shots as needed:

> Q.   . . . So how often are you taking your shots for your diabetes? Your insulin.
>
> A   I'm taking at least ten shots a day.
>
> Q   Okay. How long does it take each time?

A    How long does it take for what?

Q.    To give yourself a shot.

A    With the flex pens that I use, it's a matter of 20 seconds. . . .

Q    . . . What times of day do you do that?

A    In the morning, I take a long-acting shot at 10:00 once a day and then at – it depends on my sliding scale, what my blood sugar is and what I'm eating.

Q    Okay. I got you. So your short term or short-acting, you're just looking at –

A    Correction –

Q.    -- your monitor? Okay.

A.    And yeah. For my insulin, I'll just shoot – got a scale set up for me.
. . .

Q    . . . You carry a flex pen with you everywhere you go, plus the insulin?

A    Yes.

Q    And then you load it as needed for the sliding scale?

A    Yes. It's a loaded pen. There's a dial you turn and it says the numbers on it that you need. Yes.

Q    . . . How often are you [checking] your monitor again? How many times in an hour? . . .

A    I usually look at it probably eight or nine. I've gotten really fond of it. It's just habit at this point.

Q    . . . And how many times – are you giving yourself a shot[?] [L]ike every hour or every two hours?

A    No. Usually, . . . I need it every two hours because [of] the length of time the insulin last. You can't overlap them or you'll be in trouble. They'll just bottom me out.

11

> Q    Sure. Yeah. And then, you're looking at that every hour or so or every two hours, you're taking a shot. How long does it take you to look at the monitor—estimate this now—take you to look at the monitor, adjust your—get the [flex] pen, adjust it, and give yourself a shot and put everything back away. How long does that process usually take?
>
> A    Put it back away, at least two minutes depending on—if I'm at work, it takes longer because I don't—I have to put it in my office area. I have to get to it.
>
> Q    So—okay. So how long does it take at work?
>
> A    Probably five minutes.
>
> Q    So every two hours, you're taking five minutes of unscheduled break time to—to do your shots and everything?
>
> A    Depending on what my blood sugar is. I mean, there's—I don't take a shot every two hours. If I do, then yes.
>
> Q    Okay. Okay. Again, we're asking on average. Okay? If we're asking what's on average—
>
> A    Oh, yeah.

(Tr. at 611-13.) Finally, when asked whether she would be able to do a "sit-down job . . . eight hours a day, five days a week," she responded that she would need to be able to stand occasionally and, "I would have to have breaks to eat with my sugars and taking my insulin and whatnot extra." (Tr. at 618.)

As correctly noted by Plaintiff, five percent of an eight-hour workday totals 24 minutes, or three minutes per hour, of off-task time. (Pl.'s Br. at 12.) Although Plaintiff criticizes this time estimate as both meager and arbitrary, the exchange set out above belies both of these arguments. Plaintiff herself estimated that monitoring her blood glucose and administering insulin to regulate it as needed takes an average of five minutes every two hours in a work setting. (Tr. at 613.) Thus, the limitation can be traced directly to Plaintiff's testimony, and

12

allows Plaintiff off-task time beyond her own estimate for monitoring glucose and administering insulin. In addition, as Defendant notes, that time is in addition to ordinary breaks of 15 minutes in the morning, 30 minutes for lunch, and 15 minutes in the afternoon, (Def.'s Br. [Doc. #12] at 10 (citing SSR 96-9p, 1996 WL 374184)), for a total of over an hour and twenty minutes, which would also allow time for Plaintiff to eat or drink something to correct her blood sugar.[7]

Moreover, the ALJ addressed the need for time off task in a line of questioning with the Vocational Expert, specifically noting:

> So you heard the claimant testify regarding her need to stop and check her blood sugar and deal with it either by eating or by administering insulin. If someone had to do those tasks throughout the workday would that be construed as off-task time or would that – because it's a medical issue, would that be treated in some other way?

(Tr. at 622-23.) The VE testified that off-task time up to 9% is acceptable, but 10% or more would not be tolerated, and additional time above that for medical issues would depend on the employer. (Tr. at 622-23.)

The ALJ then included in Plaintiff's RFC the limitation that Plaintiff "would be off-task 5% of the workday (to check blood sugar levels, etc.)." (Tr. at 571.) Thus, the RFC finding itself specifically linked the time off task to the need to "check blood sugar levels." This limitation can be traced directly to Plaintiff's testimony, and to the ALJ's hypothetical to

---

[7] As set out above, Plaintiff testified that approximately once a week her blood sugar gets too low, necessitating that she stop work to use a glucose inhaler or eat or drink something sweet. (Tr. at 594.) She indicated that it could sometimes take up to half an hour for her blood sugar to come back up from a severe drop. (Tr. at 594.) Even so, the RFC assessment provides twenty minutes a day—two hours a week—in addition to the three break periods built into an eight-hour workday. Accordingly, Plaintiff fails to show that her need to eat or drink could not be accommodated by the RFC as written. Moreover, the VE testified that off-task time of up to 9% was acceptable, such that even an additional 20 minutes of time, in addition to that allowed by the RFC, would be harmless.

the VE regarding the need to account for off-task time based on Plaintiff's testimony "regarding her need to stop and check her blood sugar and deal with it either by eating or by administering insulin." (Tr. at 622-23.)

Plaintiff challenges the ALJ's use of the term "etc." as vague, rendering the RFC unsupported by substantial evidence. (Pl.'s Br. at 13) Again, however, the testimony set out above makes the source of this term clear, based on (1) Plaintiff's testimony that her five-minute time estimate encompasses not only monitoring her blood sugar levels but also administering insulin as needed and retrieving and replacing necessary supplies; (2) the ALJ's description to the VE describing the potential time off task based on Plaintiff's "need to stop and check her blood sugar and deal with it either by eating or by administering insulin", and (3) Plaintiff's own testimony that if she were going to do a full time job she would need "breaks to eat with my sugars and taking my insulin and whatnot extra." (Tr. at 612-13, 618, 622-23.) To the extent Plaintiff now argues that "etc." could instead apply to her need to take extended rest periods due to diabetes-related fatigue or make bathroom visits due to urinary frequency, neither of these interpretations are supported by the record. The ALJ explained that Plaintiff's treatment records specifically noted a lack of urinary frequency during the relevant time period, despite her hearing testimony to the contrary. (Tr. at 572, 599-600.) Although the evidence did support a finding that Plaintiff's diabetes caused fatigue, pain, and decreased mobility, the ALJ expressly accounted for these symptoms by limiting Plaintiff to standing and walking no more than 4 hours per 8-hour workday, with no more than one hour at a time of standing and/or walking, followed by at least 5 minutes in a seated position. (Tr. at 571, 572.)

As a final matter, the ALJ found that, "[a]lthough [Plaintiff] has alleged that she would be unable to work even withing the highly restrictive limitations set forth in [the RFC]," her "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 573, 572.) In particular, the ALJ cited Plaintiff's "generally mild" examination findings, "conservative" treatment for her diabetes, and the ability to perform a wide range of daily activities, including part-time work, as supportive of his findings. The ALJ specifically explained that the evidence of record established that Plaintiff "would be off-task 5% of the workday" (Tr. at 572), but that greater limitations were not consistent with the evidence of record in light of the limited treatment sought and provided (Tr. at 572, 573).

Plaintiff does not challenge the ALJ's findings regarding her subjective complaints or other portions of the RFC. Regarding the sole contention raised by Plaintiff, the issue of whether the ALJ sufficiently explained his reasoning for the determination of off-task time, the Court finds that, given (1) Plaintiff's clear testimony regarding the time needed to monitor her blood sugar and address it with insulin or by eating or drinking, (2) the ALJ's description of the off-task time to the VE based on Plaintiff's "need to stop and check her blood sugar and deal with it either by eating or by administering insulin," and (3) the ALJ's explanation in the RFC that the five-percent off task figure allowed for the management of Plaintiff's diabetes "to check blood sugar levels, etc.", the ALJ's explanation is sufficient to allow the Court to follow his reasoning, and substantial evidence supports the RFC as written.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #10] is DENIED, that

15

Defendant's Dispositive Brief [Doc. #12] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 30th day of September, 2025.

                                               /s/ Joi Elizabeth Peake
                                               Joi Elizabeth Peake
                                               United States Magistrate Judge